MELANIE A. HILL, ESQ.
Nevada Bar No. 8796
**MELANIE HILL LAW PLLC**
520 S. 7th Street, Suite A
Las Vegas, NV  89101
Tel.      (702) 362-8500
Fax.      (702) 362-8505
Email:  Melanie@MelanieHillLaw.com
*Attorneys for Plaintiff Steven Earl Carr*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STEVEN EARL CARR, an individual,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA; DAVID N. KARPEL, individually, DOES 1 through 100; and ROES 1 through 100; inclusive,<br><br>Defendants. | CASE NO.: 2:20-cv-1850-GMN-NJK<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff STEVEN EARL CARR ("MR. CARR"), by and through his counsel, MELANIE A. HILL of MELANIE HILL LAW PLLC, for his claims of relief against Defendants UNITED STATES OF AMERICA, DAVID N. KARPEL, individually, DOES 1 through 100, and ROES 1 through 100 (collectively "DEFENDANTS"), and each of them, jointly and severally, based upon knowledge, information, and reasonable belief derived therefrom, allege, complain, and state as follows in this Second Amended Complaint:

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

1.     This action seeks damages for violations of MR. CARR'S civil rights raising constitutional claims under the Fifth and Eighth Amendments to the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and under the Federal Tort Claims Act ("FTCA").   This Court has subject matter jurisdiction over Defendant UNITED STATES OF AMERICA ("UNITED STATES") on behalf of its federal employees under 28 U.S.C. § 134(b), 2671 et seq., which vests exclusive subject matter jurisdiction of FTCA litigation in the United States District Court.   Liability of Defendant UNITED STATES and this Court's jurisdiction over it is predicated specifically on 28 U.S.C. §§ 1346(b)(1) and 2674 because injuries, harms, and damages that form the basis of this complaint were proximately caused by the negligence, wrongful acts and/or omissions of employees of the United States through its agencies the United States Department of Justice ("DOJ"), the United States Attorneys' Office for the District of Nevada ("USAONV"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and/or ROES 1 through 100.  This Court has subject matter jurisdiction over the instant FTCA claims and the federal DEFENDANT named herein under 28 U.S.C. §§ 1346 and 2647.  Pursuant to 28 U.S.C. § 1346(b), MR. CARR timely and properly submitted a Claim for Damage, Injury or Death to DEFENDANT UNITED STATES and its requisite agencies and, as such, have fully satisfied and exhausted their administrative obligations to present their FTCA claims to the Court.

2.     The FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, requires that MR. CARR first exhausts administrative remedies by making a written demand to offending federal agencies before initiating actions against the UNITED STATES and those federal agencies in federal court.  The statute gives the agencies six (6) months to respond to the written demand(s).

3.      MR. CARR hand delivered an Administrative Claim on Standard Form 95 to the DOJ, the USAONV, and the ATF Las Vegas Field Office on October 2, 2020 and mailed an Administrative Claim on Standard Form 95 to the DOJ in Washington, District of Columbia and the ATF in Washington, District of Columbia for delivery on October 5, 2020 and the six-month period to respond to the Administrative Claim has therefore not yet run on the FTCA claims.  However, these FTCA claims are being included in this Second Amended Complaint in order to bring the *Bivens* claims and Nevada state law tort claims within two years of the injury to MR. CARR to preserve the Statute of Limitations on these claims and to allow all claims to be brought within one action under the one action rule as well as for judicial efficiency and judicial economy.  MR. CARR understands that his FTCA claims should therefore be stayed pending the expiration of the six-month period of time for the UNITED STATES and the federal agencies to consider and respond to the Administrative Claim.  If the UNITED STATES and GOVERNMENT DEFENDANT again move to dismiss the FTCA claims in a subsequent motion to dismiss, MR. CARR will seek a stay in lieu of dismissal of the claims to allow the six-month period to run on or about April 3, 2021. It is important to note that the government agencies typically deny the FTCA claim after a complaint is filed and MR. CARR anticipated that this may have occurred when filing his complaint rendering a request for a stay moot.

4.      This Court has supplemental jurisdiction over MR. CARR's causes of action arising under Nevada state law pursuant to 28 U.S.C. § 1367.

5.      Venue lies in the unofficial Southern Division of the United States District Court for the District of Nevada pursuant to 28 U.S.C. § 1391(a)(1) and 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1) because the underlying acts, omissions, events, injuries and related facts upon which the present action is based occurred in Clark County, Nevada and because the UNITED STATES is a defendant and one or more

defendants herein is an officer or employee of the United States.

6.     The individual defendants and DOES 1 through 100 named herein are/were law enforcement agents and employees of Defendant UNITED STATES. They were acting within the scope of their employment at all times relevant to this complaint.  The constitutional violations and tortious conduct at issue in this case involve federal agencies and employees and are therefore ultimately chargeable to the UNITED STATES itself.

7.     These individual defendants are/were agents, servants, and employees of each of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their principal and/or employer and each of the other named DEFENDANTS.  Each of the DEFENDANTS, DOES 1 through 100, and ROES 1 through 100 had approved or ratified the actions of the other DEFENDANTS, thereby making the currently named DEFENDANTS liable for the acts and/or omissions of their agents, servants and/or employees.

**PARTIES**

8.     Plaintiff STEVEN EARL CARR (hereinafter "Plaintiff" or "MR. CARR") is, and at all times herein mentioned was, a United States citizen and a resident of Clark County, Nevada.

9.     Upon information and belief, Defendant DAVID N. KARPEL ("KARPEL") is and was at all times relevant to this action a resident of Washington, District of Columbia and a Trial Attorney with the Organized Crime and Gang Section of the United States Department of Justice ("DOJ").  During the relevant time period in this lawsuit, KARPEL was directly responsible for bringing and signing the RICO Indictment against MR. CARR and his twenty-two co-defendants.  Upon information and belief, KARPEL is one of the attorneys that presented the evidence and witnesses

4

in the underlying criminal RICO case to the Grand Jury that brought this True Bill against MR. CARR.  Upon information and belief, KARPEL was continually and substantially involved in directing the investigation and developing the witness testimony that ultimately led to MR. CARR being charged in the superseding RICO indictment with one overt act being the alleged murder in Sparks, Nevada in *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13].  Specifically, it is alleged that KARPEL met with government witnesses Gary Rudnick, Jefferson Martin, and Scott Rivera multiple times prior to these witnesses testifying before the grand jury on June 7, 2017 to provide testimony that was ultimately used to indict CARR in the District of Nevada.  Upon information and belief, a RICO indictment could not be brought by the USAONV without approval from the DOJ due to DOJ policy.  KARPEL is being sued in his individual capacity.

10.     Defendant UNITED STATES OF AMERICA ("UNITED STATES") is the national federal government established by the United States Constitution.  Accordingly, it is subject to limitations imposed by the Constitution – including as relevant here, the Fifth and Eighth Amendments.  The United States is the appropriate defendant for MR. CARR'S claims herein under the Federal Tort Claims Act ("FTCA") and was at all times relevant to this action, the employer of KARPEL and DOES 1 through 100.  The UNITED STATES, through its various agencies (e.g., the DOJ, USAONV, and ATF described more specifically below) and employees (i.e., Defendants KARPEL and DOES 1 through 100) – each of whom, for purposes of MR. CARR'S FTCA claims, was acting within his/her official capacity and within the scope and course of her/his employment with the applicable federal agency – caused acts and events to occur within this forum from which MR. CARR'S claims arose.

A.     The DOJ is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the enforcement

of law and the administration of justice within the United States and doing business in this District; the administrator of several law enforcement agencies and offices, including, without limitation, the USAONV, ATF, and ROES 1 through 100; and an employer of Defendants KARPEL and DOES 1 through 100.

B.    The ATF is, and at all material times was, the investigative arm of Defendant UNITED STATES, the DOJ, and the USAONV; doing business in this District; and an employer of DOES 1 through 100.

11.    Defendants KARPEL and DOES 1 through 100 shall hereinafter collectively be referred to as the "GOVERNMENT DEFENDANTS."

12.    Upon information and belief, Defendants identified as DOES 1 through 100 and ROES 1 through 100, whether individual, corporate, associate, governmental or otherwise, caused acts and events to occur within this forum from which MR. CARR'S claims arose.  The true names and capacities of these parties is not currently known by MR. CARR, and once such identities become known, MR. CARR will seek leave of Court to amend his Complaint accordingly.

<u>STATEMENT OF FACTS</u>

13.    On June 14, 2017, MR. CARR was indicted and maliciously prosecuted by way of a Superseding Indictment for one count of conspiracy to participate in a racketeering enterprise in violation of Title 18 U.S.C. 1962(d) with the RICO enterprise identified as the "Vagos Outlaw Motorcycle Gang" in the RICO Indictment. This accusation is part of a forty-four (44) page Superseding Indictment charging MR. CARR and twenty-two (22) other Co-Defendants named in the Superseding Indictment in Count One with the racketeering conspiracy and charging MR. CARR'S co-Defendants in a number of other allegedly related specific offenses.  The incidents related to the alleged racketeering conspiracy are alleged to have begun in 2005 and

6

continued throughout the date of the Sealed Superseding Criminal Indictment, June 14, 2017 (hereinafter "RICO Conspiracy case").

14.     MR. CARR was indicted after the United States Attorneys' Office for the District of Nevada ("USAONV") entered into a plea agreement with MR. CARR in a prior conspiracy case related to his Vagos affiliation, *United States v. Kane, et. al.*, Case Number 2:13-cr-250-JAD-VCF (D. Nev.) (hereinafter "Original Conspiracy case"), on July 8, 2016 promising not to bring additional charges against him except for a crime of violence under Title 18, United Stated Code, Section 16 ("section 16"). Plea Agreement [ECF No. 217 in 2:13-cr-250-JAD-VCF (D. Nev.)], pp. 2-3.

15.     Importantly, all eight of the overt acts listed in the RICO Conspiracy which name MR. CARR are alleged to have occurred before June 25, 2013, when the grand jury returned the indictment against MR. CARR in the Original Conspiracy case.

16.     It is also important to note that in MR. CARR'S Original Conspiracy case, one defendant was dismissed entirely, most of the others received pretrial diversion and the remaining defendant, Robert Alan Coleman was dismissed from the Original Conspiracy case after he was reindicted in the RICO Conspiracy case.

17.     Upon information and belief, the UNITED STATES had witness issues in the Original Conspiracy case that resulted in the offers for pretrial diversion that were given to MR. CARR'S co-defendants in the Original Conspiracy case and the UNITED STATES knew of these issues prior to reindicting MR. CARR and Mr. Coleman in the RICO Conspiracy case.

18.     In fact, one of the overt acts *is* the Original Conspiracy, and three of the other seven overt acts relate directly to the Original Conspiracy and involve the same alleged victim.  In the remaining four overt acts, the indictment accuses MR. CARR only of minor conduct, occurring years before.

19.     As this Court knows, and as was displayed throughout the trial for the first trial group in the RICO Conspiracy case, the Government knowingly elicited testimony from witnesses who have not only issues with being honest, but are admitted liars willing to repeatedly lie under oath. As will be illustrated herein, the UNITED STATES' Superseding Indictment against MR. CARR (and his co-Defendants in the RICO Conspiracy case) is not valid as it is based on lies. It is irreparably tainted. The government cannot "fix" the Indictment in the RICO Conspiracy case.

20.     When the shooting death of Jethro Pettigrew was tried in Reno state court, Gary Rudnick testified at the trial against Ernesto Gonzalez. Mr. Rudnick testified and provided a different account of who was allegedly at the meeting prior to when the shooting occurred and where the official meeting occurred. Mr. Gonzalez was convicted at trial, but the case was later reversed on appeal by the Nevada Supreme Court. The Nevada Supreme Court stated that there was no collaborating evidence that a conspiracy to commit murder occurred at the Nugget casino. This case was never retried in Reno, but was instead included as a VICAR count and as an overt act in the RICO Superseding Indictment that ultimately resulted in acquittals of all defendants in the Group No. 1 after trial.

21.     Upon information and belief, in or around 2015 KARPEL began working on this RICO investigation of the Vagos Motorcycle Club which included this 2011 Nugget shooting.

22.     On June 10, 2015, Mr. Rudnick met with KARPEL and case agents for the first time while Mr. Rudnick was in state custody for his involvement in the Nugget shooting.

/ / /

23.    On April 1, 2015, Mr. Martin was interviewed by case agents for the first time and stated there was a conspiracy.  On April 29, 2015, Mr. Martin met with KARPEL and case agents and reaffirmed the alleged conspiracy.

24.    On February 10, 2016, KARPEL, with case agents, met with Mr. Rudnick and Mr. Rudnick provided names of some of the Vagos members that were allegedly in attendance at the meeting when the purported order was given to murder Mr. Pettigrew.

25.    Upon information and belief, Mr. Rudnick provided names and then was asked if he remembered Mr. Martin being present at the alleged meeting.

26.    Upon information and belief, Mr. Rudnick affirmed Mr. Martin's presence at the meeting after being prompted by KARPEL and case agents.

27.    Upon information and belief, Mr. Rudnick stated the side meeting occurred just outside the conference room where there was a larger all-member meeting.

28.    Upon information and belief, on March 17, 2016, Mr. Rudnick sat down with Ernesto Gonzalez's defense investigator April Higuera and recanted his previous statements and stated that there was not a conspiracy to murder Mr. Pettigrew and it was a bar fight that went bad.

29.    Upon information and belief, on May 26, 2016 KARPEL and case agents interviewed Mr. Rudnick again at the halfway house and offered assistance for housing through the Department of Homeland Security.

30.    Upon information and belief, on June 3, 2016, case agents had contact with Jill Dunaway, a friend of Mr. Rudnick, on behalf of Mr. Rudnick who stated that Mr. Rudnick had contact with defense counsel and investigator for Ernesto Gonzalez.

31.    Upon information and belief, on March 18, 2017, KARPEL was notified of the recantation of Mr. Rudnick and a task force officer, Peter Grimm talked with

Mr. Rudnick and was then told a different story by Mr. Rudnick that Mr. Rudnick lied to defense counsel and there was a conspiracy to murder Mr. Pettigrew.

32.     Mr. Rudnick testified before the Grand Jury and Trial Jury for the first trial group. When he testified at trial, he committed perjury, contradicted himself, and admitted to making false statements numerous times. More importantly, Rudnick testified at trial repeatedly to items that were inconsistent with the sworn testimony the UNITED STATES used to obtain the Superseding Indictment in the RICO Conspiracy case when he testified before the Grand Jury on June 7, 2017.

33.     Jefferson "Lunchbox" Martin testified before the Grand Jury and the Trial Jury in the trial of group No. 1. He committed perjury, contradicted himself, and admitted to making false statements a multitude of times.  These lies included numerous lies to the Grand Jury which were used to obtain the Superseding Indictment in the RICO Conspiracy case. Like Mr. Rudnick, Mr. Martin was also appointed a lawyer, Richard Wright, by this Court. Trial Transcript, October 2, 2019, p. 112.  Mr. Martin was under the impression, up until he was appointed a lawyer on September 21, 2019, that he was safe from being prosecuted. Trial Transcript, October 2, 2019, p. 116-118.

34.     Upon information and belief, the UNITED STATES has conceded Mr. Rudnick's false allegations and Mr. Martin's false allegations were presented to the Grand Jury.  These allegations were material, as they serve as underpinnings to obtaining the Superseding Indictment in the RICO Conspiracy case.

35.     At the trial of group No. 1, Mr. Rudnick testified about KARPEL'S involvement in directing the investigation of the RICO murder and developing the testimony that would ultimately be presented to the Grand Jury to ensure the Superseding Indictment would be secured as follows:

Q. And there you are in front of a Grand Jury in Santa Anna,

California, with David Karpel.

A. Yes, I was.

Q. David Karpel was the prosecutor who was part of this team, right?

A. Yes, he was.

Q. And you met with David Karpel on many occasions, didn't you?

A. Couple times, yes.

Q. You met with David Karpel after you told April Higurea that you were going to do the right thing.

A. One second.

(Witness conferring with counsel.)

THE WITNESS: Okay. Can you go ahead and ask the question.

BY MS. BLISS:

Q. My question, I will repeat for you, sir, was: You met with David Karpel after you told April Higurea that you were going to do the right thing.

A. I'm going to take the Fifth on that.

Q. Okay. And after you met with David Karpel, you testified in front of a Federal Grand Jury?

A. I'm going to take the Fifth.

Q. David Karpel was angry at you, wasn't he, for talking to April Higurea?

A. One second. Let me ask her a question.

(Witness conferring with counsel.)

THE WITNESS: Okay. Repeat the question.

BY MS. BLISS:

Q. David Karpel was angry at you for talking to April Higurea and telling her that you wanted to do the right thing, wasn't he?

A. He was mad, yes.

Group No. 1 Trial Transcript, September 24, 2019 testimony of witness Gary Rudnick, p. 25-81, l. 4-p. 25-82, l. 10.

36.   During Mr. Rudnick's testimony at the trial for Group No. 1 on September 23, 2019, he testifies that KARPEL was in multiple meetings about the alleged meeting at the Nugget casino in which Mr. Rudnick provided an inconsistent statement about the individuals present at the meeting. *See generally* Group No. 1 Trial Transcript, September 23, 2019 testimony of witness Gary Rudnick, p. 65.

37.     Out of the presence of the jury, the defense counsel raised the fact that they received a disclosure from the Government that Mr. Martin lied before the Grand Jury because he felt pressure from KARPEL to make up the side meeting and Mr. Martin fabricated the list of people that were alleged to be in the side meeting.  Based on this argument by defense counsel, the court allowed the questioning of Mr. Rudnick regarding if he also had issues with KARPEL pressuring him.  *See generally* Group No. 1 Trial Transcript, September 24, 2019 testimony of witness Gary Rudnick, pp. 6-18.

38.     During Mr. Rudnick's testimony at the trial for Group No. 1 on September 24, 2019, Dan Hill questions Mr. Rudnick about the multiple statements he has made over the years regarding a side meeting and pushes Mr. Rudnick on providing conflicting stories regarding certain member participants during his meetings with KARPEL prior to testifying before the Grand Jury in California.  *See generally* Group No. 1 Trial Transcript, September 24, 2019 testimony of witness Gary Rudnick, pp. 86-92.

39.     Upon information and belief, these meetings between Mr. Rudnick and KARPEL occurred on June 10, 2015, February 10, 2016, and May 26, 2016.

40.     At the trial of group No. 1, Mr. Martin testified about KARPEL'S involvement in directing the investigation of the RICO murder and developing the testimony that would ultimately be presented to the Grand Jury to ensure the Superseding Indictment would be secured as follows:

> Q. Okay. I just want to go back, because I know this has been
> a long period of time, but do -- you recall that your first
> meeting with Mr. Karpel was April 29th, 2015, in Santa Ana?
> A. I could -- yeah. I don't remember the date, but I remember
> meeting with him.
> Q. Okay. Well, it was a pretty -- it was a pretty significant
> event, wasn't it? Because you called Agent Neal the next day

1   and expressed to him that you were worried that the lawyer was
2   mad with you.
    A. Correct.
3   Q. And, so, my question is, what happened during that first
    meeting with Mr. Karpel that caused you to feel the next day
4   that you needed to reach out to Agent Neal and say, look, what
5   did I do wrong, I feel like he's mad with him?
6   A. Because it's the government. I'm scared of the government.
    Like, if I said something wrong, I didn't know if I was going
7   to jail or not. I didn't know what going on.
8   Q. Okay.
    A. Like, again, I didn't have a lawyer or anything at the
9   time.
10  Q. Did you feel like, at that first meeting, that things that
    you were telling Mr. Karpel were things that he didn't want to
11  hear?
12  A. I felt he didn't believe me.
    Q. Was there something he did -- I mean, can you articulate
13  something that he did that made you feel that way?
14  A. I -- just scary little man.
    Q. I'm sorry?
15  A. Scary little man. A scary little man, you know?
16  Q. Oh. Well, was he -- was it because he got fired up and
    pounded the table?
17  A. He got fired up. He's just -- you know, he's -- I can't
18  explain it because it's so long ago. You know, I was scared,
    you know.
19  Q. So it was his demeanor during the meeting that caused you
20  to be alarmed?
    A. Well, yeah.
21  Q. Okay. Did -- did he -- and you say he got fired up. Did
22  he get angry?
    A. I -- I don't know his demeanor when he gets angry. Alls I
23  know he was -- it was just a scary situation for me.
24  Q. Did he get loud?
    A. Well, of course. He's a lawyer.
25  Q. Did he get in your face?
26  A. He sat right across from me.
    Q. Did he make gestures that made him -- that made you think
27  that he didn't buy your -- what you were saying?
28  A. Ma'am, I know you're looking for direct answers but here's
    the truth, the man scared me, he's the government, okay?

13

You're trying to get feelings from me from back then and I don't know what to tell you, you know.

Q. Did he -- did he at any point in time, between that day when you first met him back in April of 2015 and a week ago Sunday, offer to get you legal representation?

A. No.

Q. During your meetings with him, did he tell you that you were lying?

A. I don't -- I don't recall that. I don't remember.

Q. During the meetings that you had with Mr. Karpel and members of the federal government, were you told about evidence that they claimed to have that they thought incriminated you?

A. No.

Q. Were you told about conversations that Mr. Karpel or other members of the federal government had had with other people about the Vagos or what went on at the Nugget on September 23rd, 2011?

A. No.

Q. Were you shown documents that purported to be other people's statements to law enforcement?

A. No.

Q. Were you ever shown what appeared to be, you know, transcripts of court testimony?

A. No.

Q. Were you ever encouraged to speak to somebody else that was assisting the federal government?

A. I don't understand the question.

Q. Well, during the course of your meetings with Mr. Karpel and members of federal law enforcement, you became aware that there were people who were cooperating and providing the federal government with information, didn't you?

A. Yeah. I heard something like that. There was other witnesses. That's all I know.

Q. Okay. And that's something that Mr. Karpel and the members of law enforcement that you met with told you?

A. No. Karpel was trying to get the answers from me.

Q. Okay. Did anybody ever encourage you to try to meet with any of these other people that were helping the federal government?

A. No. Excuse me.

Q. Did anybody from the federal government ever tell you that Mr. Karpel was unhappy with your statements?

14

1    A. Not to my knowledge.

Q. Is it fair to say -- I think you described for us that your

2    first meeting with Mr. Karpel, you were intimidated by him,

3    both because of his position and his demeanor?

A. Correct.

4    Q. And the circumstances of the encounter?

5    A. Correct.

Q. Did that continue throughout every subsequent meeting you

6    had with Mr. Karpel?

7    A. I was always nervous to see that man.

Q. And did you feel pressure to try to please him?

8    A. Yes.

9    Q. Okay. And, specifically, the pressure to try to please him

was to tell him a version of events that he wanted to hear?

10    A. I -- yeah.

11    Q. And because of the pressure that you felt, did you change

your story about what happened at the Nugget on September 23rd,

12    2011?

13    A. Yes.

Q. And I just want to talk about some specific areas, where

14    your -- where your story about the events changed because of

15    that pressure. Specifically, did you change your story as to

whether the killing of Jethro Pettigrew was a planned hit?

16    A. Yes.

17    Q. Okay. Did you change your story as to whether or not the

Vagos international leadership had issued a green light to kill

18    Pettigrew?

19    A. Yes.

Q. Did you change your story as to whether you participated in

20    some sort of side meeting after the meeting at the Nugget on

21    September 23rd, 2011?

A. No.

22    Q. Okay. Specifically, I want to talk to you about -- and I'm

23    just going to -- I want to talk to you about this one

particular issue. On April 29th, 2015, when you spoke with

24    Mr. Karpel and members of federal law enforcement, did you --

25    did you tell them that you might have observed a side meeting

but that you were not a participant in it?

26    A. I told them I was out there saying hi to the brothers and

27    stuff.

Q. Okay.

28    A. I was out there -- I don't know what you called a meeting.

1   Everybody was out there.

2   Q. Okay. Well, one of the topics that repeatedly comes up in
your interviews with federal law enforcement is whether or not

3   there was a side meeting after the all members meeting that
night.

4   A. I don't --

5   Q. Right?

6   A. I don't think -- I don't -- I don't think it was a side
meeting.

7   Q. Okay. So, let me move forward and I'll circle back to
this.

8   Did you change -- as a result of the pressure that you

9   felt, did you change your story about who attended a side
meeting?

10  A. I got the -- yes.

11  Q. And did you also change your story about what was
supposedly said at this "side meeting"?

12  A. No.

13  Q. As a result of the pressure that you felt, did you change
your story as to whether or not Jeff Voll asked you to lie

14  about the green light -- a green light at the trial in Reno?

15  A. Yes.

16  Q. And did you change your story about whether it was the
Vagos that sent you up to Reno to lie?

17  A. Yes.

18  Q. And did you change your story about David Houston, who was
Ernesto Gonzalez's attorney in Reno, did you change your story

19  about whether he provided you a script of how to lie at the
trial?

20  A. Yes.

21  Q. And did you also change your story about whether the
international leadership issued an order to kill

22  Bradley Campos?

23  A. Excuse me?

24  Q. Subsequent -- the -- let me see if I can orient you because
I may have just jumped too far. After the situation happened

25  at the Nugget, Rudnick was kicked out of the Vagos; right?

26  A. Yes.

27  Q. And there were some discussions between you and Mr. Karpel
and members of federal law enforcement having to do with the

28  fact that Bradley Campos didn't act quick enough to kick
Rudnick out or was supporting Rudnick in some manner.

16

Do you recall those discussions?
A. Correct.
Q. Okay. And -- and at least during some of your meetings
with federal law enforcement, you said that there was a
decision from the international leadership of the Vagos to put
a green light on Campos and kill him.
A. We were told to handle him. I don't. . . know killing.
Q. Okay. So my question is, is that something that you
changed your story on as a result of the pressure you felt --
A. Yes.
Q. -- through Karpel?
The answer is yes?
A. Yes.
Q. Okay. Thank you. I'm sorry. I just don't think it made
it to the record.

Group No. 1 Trial Transcript, October 2, 2019 (PM) testimony of witness Jefferson Martin, p. 135, l. 21-p. 143, l. 10.

41.     During Mr. Martin's testimony at the trial for Group No. 1 on October 9, 2019, he testifies that he was threatened by KARPEL and was scared of KARPEL because KARPEL was mad at him and Mr. Martin therefore provided false testimony to make KARPEL happy.  *See generally* Group No. 1 Trial Transcript, October 9, 2019 (AM) testimony of witness Jefferson Martin, pp. 27-47.  Mr. Martin further testified that morning that he was influenced by the power that KARPEL had over him and KARPEL'S insistence that KARPEL wanted to hear Mr. Martin say that a "greenlight" was ordered and Mr. Martin lied due to KARPEL's influence over him and KARPEL's desire to secure the Superseding Indictment.  *See generally* Group No. 1 Trial Transcript, October 9, 2019 (AM) testimony of witness Jefferson Martin, pp. 86-105.

42.     Upon information and belief, these meetings between Mr. Martin and KARPEL occurred on April 29, 2015 and May 10, 2016.

43.     Upon information and belief, meetings also took place between Scott Rivera and KARPEL on May 10, 2016 and March 14, 2017.

44.     Mr. Rudnick, Mr. Martin, and Mr. Rivera testified before the grand jury on June 7, 2017 to provide testimony that was ultimately used to indict CARR and others in the Superseding RICO Indictment in the District of Nevada.

45.     When the DOJ and USAONV brought the RICO Superseding Indictment against MR. CARR, the DEFENDANTS knew or should have known that the Grand Jury testimony was fabricated in large part by the pressure exerted by KARPEL on witnesses Mr. Rudnick and Mr. Martin to fabricate evidence as testified by these witnesses at the trial for Group No. 1. *See infra*.

46.     When the DOJ and USAONV brought the RICO Superseding Indictment against MR. CARR, the DEFENDANTS knew or should have known that UNITED STATES had promised and agreed in the Plea Agreement they signed and entered into with MR. CARR in the *Kane* case on July 8, 2016 not to bring additional charges against MR. CARR except for a crime of violence under Section 16, knew or should have known that the RICO Conspiracy was not a crime of violence under section 16, and consciously decided to name MR. CARR in the RICO Indictment and direct the marshals to arrest him upon his release from the Bureau of Prisons in the *Kane* case in the Central District of California.

47.     With credit for good time, MR. CARR completed his sentence for the Original Conspiracy case on or about July 5, 2017.  The same day MR. CARR was released from Bureau of Prisons' custody, the marshals arrested him for the RICO Conspiracy case.

48.     MR. CARR had a detention hearing in the Central District of California on or about July 7, 2017 and MR. CARR was detained pending trial.

49.     MR. CARR had a subsequent initial appearance and detention hearing in the District of Nevada on July 27, 2017 and the Court, finding from the record that the defendant had a detention hearing at the time of his arrest in the Central District of

California, ordered that detention would continue for MR. CARR pending trial.

50.     On May 18, 2018, MR. CARR'S counsel in the RICO Conspiracy case filed a motion to dismiss count one of the superseding indictment against him in the RICO Conspiracy case because it violated the plea agreement between MR. CARR and the UNITED STATES in the Original Conspiracy case.

51.     In MR. CARR'S Plea Agreement in the Original Conspiracy case, the UNITED STATES promised it would not prosecute MR. CARR for other offenses arising from the investigation that resulted in the plea agreement and based on conduct known to the UNITED STATES except for a crime of violence under Section 16.  Through the Plea Agreement, the UNITED STATES only retained the authority to prosecute MR. CARR for an offense that qualified as a crime of violence under section 16.  The RICO Conspiracy was not an offense that qualified as a crime of violence under section 16 as successfully argued and alleged in MR. CARR'S motion to dismiss that Judge Hoffman recommended be granted in an R&R filed on September 21, 2018 that resulted in the UNITED STATES dismissing MR. CARR from the RICO Conspiracy case fourteen days after Judge Hoffman filed his R&R.

52.     The RICO Indictment and subsequent prosecution of MR. CARR arose from the Operation Pure Luck investigation, an investigation that resulted in the prior written Plea Agreement and is based on conduct the UNITED STATES knew about before signing that Plea Agreement that was filed in the Original Conspiracy case on July 8, 2016.  The charged offense in the RICO Conspiracy case—conspiracy to participate in a racketeering enterprise—is not a crime of violence under section 16, the only crime excluded from the MR. CARR'S Plea Agreement that the UNITED STATES retained the right to bring charges against MR. CARR for.  The relevant provision of MR. CARR'S Plea Agreement stated:

D.     <u>Additional Charges</u>.  The United States agrees not to bring any

additional charges against the defendant arising out of the investigation in the District of Nevada that culminated in this Plea Agreement and based on conduct known to the United States except that the United States reserves the right to prosecute the defendant for any crime of violence as defined by 18. U.S.C. § 16.

Plea Agreement for Original Conspiracy case, [ECF No. 217 in 2:13-cr-250-JAD-VCF (D. Nev.)], pp. 2-3.

53.   MR. CARR was the only defendant who pled guilty and took responsibility in the Original Conspiracy case.

54.   The timing of certain events during the two prosecutions is significant. MR. CARR's counsel from the Federal Public Defender's Office in Nevada in both the Original Conspiracy case and RICO Conspiracy case prepared and attached a timeline to assist the Court in both motions to dismiss.  The "Operation Pure Luck" Timeline is included here:



### *2013 Original Conspiracy Indictment Arising from Operation Pure Luck*

55.   In June 2013, the UNITED STATES sought to indict MR. CARR with one count of conspiracy to interfere with commerce by extortion under Title 18, United States Code, Section 1951(a).  Original Conspiracy [ECF No. 1 in 2:13-cr-250-JAD-VCF (D. Nev.)].  The grand jury obliged.  The Original Conspiracy indictment charged five other defendants: Robert Coleman, Robert Kane, William Congero, Eric Panter, and Thomas McNamara.  *Id.*  The indictment alleged the defendants collectively conspired to interfere with commerce by extortion in Nevada in June 2009.  *Id.*  The

indictment also alleged that, in June 2009, the defendants attacked a former member of the Vagos Motorcycle Club, L.T., stole L.T.'s Harley Davidson and personal effects, and attempted to burglarize L.T.'s his home.  *Id.*

56.    In July 2016, after years of pretrial litigation, MR. CARR accepted the UNITED STATES' written plea agreement and pled guilty to the Original Conspiracy. Original Conspiracy, [ECF Nos. 216, 217, 272].  In exchange for MR. CARR'S guilty plea and waiver of his trial and appellate rights, the UNITED STATES promised MR. CARR that no additional charges would be brought against him "arising out of the investigation in the District of Nevada that culminated in this Plea Agreement and based on conduct known to the United States except that the United States reserves the right to prosecute the defendant for any crime of violence as defined by 18. U.S.C. § 16." *Id.*

### 2016 Rico Indictment Arising from Operation Pure Luck

57.    In September 2016, the UNITED STATES obtained a new indictment charging five members of the Vagos Motorcycle Club with offenses that allegedly occurred in September 2011.  *United States v. Neddenriep, et al.*, 2:16-cr-265-GMN-CWH, ECF No. 1.  The indictment was sealed as to all defendants.  RICO Conspiracy [ECF Nos. 2-6].

58.    The UNITED STATES did not initially seek to charge MR. CARR in the new case filed on September 6, 2016.

59.    In October 2016, MR. CARR was sentenced for the Original Conspiracy. The district court sentenced MR. CARR to 12 months and one day in prison, to be followed by two years of supervised release.  Original Conspiracy [ECF Nos. 229, 230, 273].

60.    In June 2017, the UNITED STATES obtained a superseding indictment in the *Neddenriep* case, adding more charges and defendants.  The superseding

21

indictment was entitled *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13] ("RICO Indictment"). The RICO indictment was also sealed as to all newly added defendants. RICO Conspiracy [ECF Nos. 14-36]. One of the new charges was conspiracy to participate in a racketeering enterprise under 18 U.S.C. § 1962(d), count one. RICO Conspiracy [ECF No. 13], pp. 3-35.

61. Two of the new defendants charged with the RICO Conspiracy are MR. CARR and Robert Coleman. *Id.* The RICO Conspiracy alleges eight overt acts that include MR. CARR. RICO Conspiracy, [ECF No. 13], pp. 17, 25-26, 29-30 (paragraphs 3, 48, 49, 50, 56, 74, 75, and 78). All the alleged acts involving MR. CARR occurred before May 2013, i.e., before the UNITED STATES entered into its written plea agreement with MR. CARR in the Original Conspiracy case. *Id.* at pp. 17, 25, 26 29-30. In fact, one of the overt acts *is* the Original Conspiracy, *id.* at 17, and three of the other seven overt acts relate directly to the Original Conspiracy and involve the same alleged victim, *id.* at 25 (paragraphs 48-50). In the remaining four overt acts, the indictment accuses MR. CARR only of minor conduct, occurring years before.

### MR. CARR Completes his Prison Sentence for the Original Conspiracy Case and is Immediately Arrested on the RICO Conspiracy Case

62. With credit for good time, MR. CARR completed his sentence for the Original Conspiracy case on July 5, 2017. The same day he was released from Bureau of Prisons custody, the marshals arrested him for the RICO Conspiracy case. RICO Conspiracy case, ECF No. 307. He was detained pending trial. *Id.* at ECF Nos. 311, 355.

63. In July 2017, the UNITED STATES moved to dismiss the Original Conspiracy case against Mr. Coleman. Original Conspiracy case [ECF No. 242]. The UNITED STATES admitted the Court should dismiss the Original Conspiracy case

against Mr. Coleman because:

> The offense alleged in this indictment is the *same as an overt act* in the RICO conspiracy charge the Defendant is now facing.

Original Conspiracy case [ECF No. 242] (emphasis added).  The Court also dismissed the Original Conspiracy case against Mr. Coleman.  Original Conspiracy case [ECF No. 247].

### The UNITED STATES *Violated the Plea Agreement by Charging MR. CARR with the RICO Conspiracy Case*

64.     In its Plea Agreement, the UNITED STATES assured MR. CARR it would not bring additional charges against him arising from the investigation that culminated in the Original Conspiracy and based on conduct "known to the government" except for a crime of violence under Section 16.  Original Conspiracy case [ECF No. 217], pp. 2-3.  The UNITED STATES retained only the limited authority to prosecute MR. CARR for any offense that qualified as a crime of violence, as defined by section 16.  *Id.*

65.     The overt acts alleged against MR. CARR in the RICO Conspiracy case did not fall within this limited exception to the prosecution bar.  MR. CARR therefore filed a motion to dismiss on May 18, 2018requesting that the Court enforce his plea agreement and dismiss the RICO Conspiracy case.

66.     Upon information and belief, an agent with ATF testified before the Grand Jury to secure the RICO Indictment against MR. CARR.  MR. CARR believes that material misrepresentations may have been made to the grand jury to secure the Superseding Indictment against him in the RICO Conspiracy case and will seek a Court Order to obtain the grand jury transcripts in discovery in this case to support this allegation.

***The Original and RICO Conspiracies Arose Out of the <u>Same</u> Investigation, and the RICO Conspiracy Case is Based on Conduct Known to the UNITED STATES when it Entered the Plea Agreement***

67.     The RICO Conspiracy case derived from the UNITED STATES' investigation of the Vagos Motorcycle Club that culminated in MR. CARR's guilty plea to the Original Conspiracy case.   Furthermore, all this conduct was known to the UNITED STATES when MR. CARR pled guilty in the Original Conspiracy case.

68.     Every overt act involving MR. CARR in the RICO Conspiracy case predates July 2016—the date the UNITED STATES and MR. CARR signed the Original Conspiracy plea agreement.  RICO Conspiracy case [ECF No. 13], pp. 17, 25, 26, 29-30.  Only six of the 103 alleged overt acts occurred after July 2016.  RICO Conspiracy [ECF No. 13], pp. 33-34 (¶¶ 97-98, 100-103).

69.     Furthermore, the UNITED STATES gathered evidence for the Original Conspiracy case and the RICO Conspiracy case during the same investigation that began before July 2016.  ATF was the investigative agency and upon information and belief an agent with ATF testified before the grand jury to secure MR. CARR's Indictment in the RICO Conspiracy case.

70.     As early as April 2010, a joint task force of federal and state officers began investigating the Clark County Vagos Motorcycle Club.  Task force officers named the investigation "Operation Pure Luck." *Id.*

71.     To carry out Operation Pure Luck, officers used a confidential informant. *Id.*  The task force also used an undercover task force officer to gather information. *Id.*  The undercover officer infiltrated the club around August 2011 and became a full member in July 2012.  *Id.*

72.     As part of the investigation, the undercover purchased guns, drugs, and stolen motorcycles from other Vagos members.  *Id.*  The undercover also recorded

24

alleged violent crimes. *Id.* This officer remained undercover until at least June 2013. *Id.*

73. Most obviously showing these cases arise from the same investigation and the UNITED STATES' knowledge, the UNITED STATES alleged in RICO Conspiracy overt act Paragraph 3 that MR. CARR committed the Original Conspiracy to extort L.T. RICO Conspiracy case [ECF No. 13], p. 17; Original Conspiracy case [ECF Nos. 1, 216, 217, 272].

74. The UNITED STATES' evidence for the Original Conspiracy case and the RICO Conspiracy case arose out of the same Operation Pure Luck Investigation. Discovery from the Original Conspiracy case and the RICO Conspiracy case further demonstrates the same investigation and the UNITED STATES' knowledge for the remaining overt acts involving MR. CARR. Not only did the UNITED STATES use surveillance cameras to record most of MR. CARR'S alleged conduct, an undercover officer observed most of the conduct.

75. This fact formed the basis for MR. CARR'S argument in his motion to dismiss that the UNITED STATES could not claim that it was unaware of the conduct for which he was indicted in the Original Conspiracy case. He further argued that this was especially true because the same Assistant United States Attorney ("AUSA") who prosecuted and indicted the Original Conspiracy case was one of the AUSAs that indicted and prosecuted the RICO Conspiracy case.

76. MR. CARR successfully argued in his motion to dismiss with prejudice to enforce the Plea Agreement filed on May 18, 2018 that prosecuting him in the RICO Conspiracy case violated his plea agreement in the Original Conspiracy case and therefore the RICO Conspiracy case must be dismissed with prejudice as against MR. CARR.

77.    MR. CARR filed a second Motion to Dismiss with prejudice on May 18, 2018 on constitutional grounds seeking to dismiss the RICO Indictment against MR. CARR because it violated his rights under the Double Jeopardy Clause and the Due Process Clause of the Fifth Amendment.

78.    On the date the UNITED STATES' objections to Judge Hoffman's R&R recommending that the RICO Indictment against MR. CARR were due to be filed, the UNITED STATES filed a Motion to Dismiss Criminal Indictment Pursuant to Federal Rule of Criminal Procedure 48(a) and Judge Navarro signed the order dismissing the case against MR. CARR without prejudice and closed the case on October 5, 2018.

79.    This second motion to dismiss on constitutional grounds was still pending when the RICO Indictment was dismissed against MR. CARR.

80.    MR. CARR was thereafter released from custody on or about October 7, 2018 after serving fifteen (15) months in federal custody.

81.    The harassment and abuse of MR. CARR at the hands of the GOVERNMENT DEFENDANTS took place from June 14, 2017 until October 5, 2018, the day the UNITED STATES finally dismissed the indictment against MR. CARR and his ordeal with the DEFENDANTS finally concluded when he was released from custody on or about October 7, 2018.

### FIRST CAUSE OF ACTION
**(False Arrest and Imprisonment in Violation of Fifth Amendment)**
**Plaintiff's *Bivens* Claim Against the Government Defendants**

82.    MR. CARR realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

83.    The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Superseding Indictment against MR. CARR and the other Defendants knowing that Mr. Rudnick had recanted before he testified before the Grand Jury in

California and knowing that KARPEL had continual and substantial involvement in directing the investigation and developing the witness testimony that ultimately led to Mr. CARR being charged in the RICO Superseding Indictment with an overt act being the alleged murder in Sparks, Nevada in *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13] as alleged in detail in the Statement of Facts caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law.

84.    When, as KARPEL did here, "prosecutors abandon the confines of their offices and assume the role of an investigator, they are exposed to the same liability which attaches to any officer or investigator for performing that investigative function." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 (1993) ("A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity."); *Burns v. Reed*, 500 U.S. 478, 494-496 (1991).

85.    The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Indictment against MR. CARR knowing that the UNITED STATES had agreed in a Plea Agreement with MR. CARR in the Original Conspiracy "not to bring any additional charges against the defendant [MR. CARR] arising out of the investigation in the District of Nevada that culminated in this Plea Agreement and based on conduct known to the United States except that the United States reserves the right to prosecute the defendant for any crime of violence as defined by 18 U.S.C. 16" prior to indicting MR. CARR on June 14, 2017 caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law and subjecting him to Double Jeopardy by charging him with a RICO conspiracy for the same overt acts that he pled guilty to and was incarcerated for in the Original Conspiracy after the UNITED STATES promised MR. CARR that no additional charges would be

27

brought against him except for a crime of violence under section 16 knowing that the RICO conspiracy was not a crime of violence under section 16.

86.     MR. CARR has a Fifth Amendment right to be free from false arrest and imprisonment.   On information and belief, some or all of the individual GOVERNMENT DEFENDANTS caused and effectuated the Indictment and arrest of MR. CARR knowing of the lies to the Grand Jury, pressure to fabricate the story of the shotting of Mr. Pettigrew by KARPEL in witness interviews with Mr. Rudnick, Mr. Martin, and Mr. Rivera, and the UNITED STATES' promise not to bring additional charges against MR. CARR in the District of Nevada except for a crime of violence under Section 16.   With that knowledge, DEFENDANTS collectively arrested and imprisoned MR. CARR for fifteen (15) months.

87.     "[A] criminal defendant has a due process right to enforce the terms of his plea agreement." *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006). When the government indicts a defendant with a new charge that is barred by the plea agreement, the defendant may seek specific performance of the plea agreement by moving to dismiss the new charge. *United States v. Plascencia-Orozco*, 852 F.3d 910, 920 (9th Cir. 2017); *see also* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.").

88.     If the new charge breaches the plea agreement, rescission of the plea agreement is not a proper remedy when the defendant has already fulfilled his obligations under the plea agreement—including pleading guilty and serving his sentence—because rescission cannot repair the harm caused by the government's breach. *Buckley*, 441 F.3d at 699.   Rather, the remedy is specific performance, which in the context of MR. CARR's RICO Conspiracy case means dismissing the new RICO Indictment pursuant to *United States v. Transfiguracion*, 442 F.3d 1222, 1237 (9th

Cir. 2006).

89.    THE DEFENDANTS collectively reindicted and imprisoned MR. CARR for fifteen (15) months until he was able to obtain a R&R from Judge Hoffman recommending that his plea agreement be enforced and recommending that his motion to dismiss with prejudice to enforce plea agreement be granted.

90.    On the date the UNITED STATES' objections to the R&R were due, the UNITED STATES filed a Motion to Dismiss Criminal Indictment Pursuant to Federal Rule of Criminal Procedure 48(a) and Judge Navarro signed the order dismissing the case against MR. CARR without prejudice and closing the case on October 5, 2018. MR. CARR was thereafter released from custody on or about October 7, 2018.

91.    On information and belief, at all relevant times, some or all of the individual GOVERNMENT DEFENDANTS committed, knew of, and/or acquiesced in all of the above-described acts.  The GOVERNMENT DEFENDANTS conduct was done intentionally, with deliberate indifference, negligently, and/or with reckless disregard, of MR. CARR'S rights.  By the acts alleged herein, the GOVERNMENT DEFENDANTS conduct has proximately caused harm to MR. CARR.

92.    On information and belief, the actions, orders, authorizations, and other conduct of some or all of the individual GOVERNMENT DEFENDANTS deprived MR. CARR of his right to be free from unlawful arrest and imprisonment and gives rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). As a result of the GOVERNMENT DEFENDANTS' actions, MR. CARR suffered damages, including but not limited to, actual damages, humiliation, fear, loss of liberty, and emotional distress.

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CAUSE OF ACTION**
**(Violation of Double Jeopardy Provision and Violation of the Due Process Clause of Fifth Amendment)**
**Plaintiff's *Bivens* claim Against the Government Defendants**

93.     MR. CARR realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

94.     The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Indictment against MR. CARR knowing that the UNITED STATES had agreed in a Plea Agreement with MR. CARR in the Original Conspiracy "not to bring any additional charges against the defendant [MR. CARR] arising out of the investigation in the District of Nevada that culminated in this Plea Agreement and based on conduct known to the United States except that the United States reserves the right to prosecute the defendant for any crime of violence as defined by 18 U.S.C. § 16" prior to indicting MR. CARR on June 14, 2017 caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law and subjecting him to Double Jeopardy by charging him with a RICO conspiracy for the same overt acts that he pled guilty to and was incarcerated for in the Original Conspiracy after the UNITED STATES promised MR. CARR that no additional charges would be brought against him except for a crime of violence under section 16 knowing that the RICO conspiracy was not a crime of violence under section 16.

95.     The Due Process Clause requires "fair play" in the criminal justice system and protects defendants from fundamentally unfair prosecutorial conduct. *See Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016) (explaining Due Process Clause exists "as a safeguard against fundamentally unfair prosecutorial conduct"); *Doggett v. United States*, 505 U.S. 647, 666 (1992) (Thomas, J., dissenting) ("[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by

30

the government in criminal proceedings."); *United States v. American Honda Motor Co.*, 273 F. Supp. 810, 819 (N.D. Ill. 1967) (explaining Due Process Clause "is essentially a recognition of the requirement of fundamental fairness and fair play").

96.     Courts have recognized the unfairness inherent in charging in successive prosecutions offenses arising out of the same transaction; "[t]he government is not a ringmaster for whom individuals and corporations must jump through a hoop at their own expense each time it commands." *American Honda Motor Co., Inc.*, 273 F. Supp. at 820; *see Adamson v. Ricketts*, 865 F.2d 1011, 1017–20 (9th Cir. 1988) (en banc); *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986); *see also Abbate v. United States*, 359 U.S. 187, 196–201 (1959) (Brennan, J., concurring) (characterizing as "disturbing" government insistence that it be allowed to bring successive prosecutions under different statutes for same set of facts).

97.     In fact, even the government recognizes the potential problems with successive prosecutions and consequently mandates special approval beforehand. *See* U.S. Attorneys' Manual § 9-2.031 (Petite policy). Thus, "entirely apart from the double jeopardy provision of the Fifth Amendment," the Due Process Clause protects MR. CARR from harassment by the government through "successive grand jury inquiries and indictments for alleged separate conspiracies arising out of the same transaction." *American Honda Motor Co.*, 271 F. Supp. at 987; *see Barnett*, 375 F.2d at 237.

98.     The UNITED STATES conducted one investigation into one organization, obtaining one conviction against MR. CARR.  Not satisfied with MR. CARR's one-year sentence, the UNITED STATES sought to prosecute MR. CARR a second time for an offense that "aris[es] out of the same nucleus of operative facts as the original charge" and is not a crime of violence under section 16.  *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986) (alteration in original) (quoting *United*

31

*States v. Robison*, 644 F.2d 1270, 1272 (9th Cir. 1981)); *see Adamson v. Ricketts*, 865 F.2d 1011, 1017–20 (9th Cir. 1988) (en banc), *abrogated on other grounds by Walton v. Arizona*, 497 U.S. 639 (1990).

99.    Both charges allege MR. CARR agreed to promote the goals of the Vagos Motorcycle Club through unlawful activities.  Both involve the same places, people, and time.  And both rely on the same incident from June 2009—the alleged extortion of a former club member.

100.    But the charges differed in one significant way: the RICO Conspiracy allowed for a significantly higher sentence than MR. CARR received on the previous conviction.  *See* 18 U.S.C. § 1963; *see also Martinez*, 785 F.2d at 669 ("[I]f [a] prosecutor, faced with a disappointing result, acts so as to 'up the ante' for the defendant, the presumption of vindictiveness arises and must be rebutted if the government is to prevail.").  In fact, the UNITED STATES was seeking life in prison in the RICO Conspiracy case.

101.    There was no indication from the record that the successive prosecutions of MR. CARR resulted from a reasoned prosecutorial decision, as opposed to dissatisfaction with the result of the first proceeding.

102.    Not only was MR. CARR's alleged participation in the offense completed four years before he was sentenced for the Original Conspiracy, but several of his current codefendants already had been charged with violating RICO.  *Cf. Feliciano v. United States*, 914 F. Supp. 776, 781 (D.P.R. 1996) (explaining that prosecutor's duty of good faith "encompass[es] in certain cases an obligation to inform a defendant during plea bargaining negotiations of other possible criminal charges which may be filed."), *aff'd sub nom. Rivera-Feliciano v. United States*, 107 F.3d 1 (1st Cir. 1997). The prosecutor's actions suggest a reasonable likelihood of vindictiveness and harassment and justify liability for violating MR. CARR's Due Process Rights under

the Fifth Amendment.

103.   MR. CARR has a Fifth Amendment right to be free from violations of the Double Jeopardy Provision and the Due Process Clause in the Fifth Amendment.

104.   On information and belief, some or all of the individual GOVERNMENT DEFENDANTS caused and effectuated the arrest of MR. CARR knowing of the UNITED STATES' promise not to bring additional charges against MR. CARR in the District of Nevada except for a crime of violence under section 16 therefore violating his right not to be subjected to violations of the Double Jeopardy provision and the Due Process Clause in the Fifth Amendment.

105.   The GOVERNEMENT DEFENDANTS collectively indicted and imprisoned MR. CARR for fifteen (15) months until he was able to obtain a R&R from Judge Hoffman recommending that his plea agreement be enforced and recommending that his motion to dismiss with prejudice to enforce plea agreement be granted.

106.   On the date the UNITED STATES' objections to the R&R were due, the UNITED STATES filed a Motion to Dismiss Criminal Indictment Pursuant to Federal Rule of Criminal Procedure 48(a) and Judge Navarro signed the order dismissing the case against MR. CARR without prejudice and closing the case on October 5, 2018. MR. CARR was thereafter released from custody on or about October 7, 2018.

107.   On information and belief, at all relevant times, some or all of the individual GOVERNMENT DEFENDANTS committed, knew of, and/or acquiesced in all of the above-described acts.  The GOVERNMENT DEFENDANTS' conduct was done intentionally, with deliberate indifference, negligently, and/or with reckless disregard, of MR. CARR's rights.   By the acts alleged herein, the GOVERNMENT DEFENDANTS' conduct has proximately caused harm to MR. CARR.

108.   On information and belief, the actions, orders, authorizations, and other conduct of some or all of the individual GOVERNMENT DEFENDANTS deprived MR. CARR of his right to be free from double jeopardy and gives rise to a cause of action for damages directly under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  As a result of the GOVERNMENT DEFENDANTS' actions, MR. CARR suffered damages, including but not limited to, actual damages, humiliation, fear, loss of liberty, and emotional distress.

### THIRD CAUSE OF ACTION
### (Violation of the Eighth Amendment)
### Plaintiff's *Bivens* claim Against the Government Defendants

109.   MR. CARR realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.   The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Superseding Indictment against MR. CARR and the other Defendants knowing that Mr. Rudnick had recanted before he testified before the Grand Jury in California and knowing that KARPEL had continual and substantial involvement in directing the investigation and developing the witness testimony that ultimately led to Mr. CARR being charged in the RICO Superseding Indictment with an overt act being the alleged murder in Sparks, Nevada in *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13] as alleged in detail in the Statement of Facts caused MR. CARR significant pain and suffering and caused MR. CARR severe psychological harm, constituting cruel and unusual punishment in violation of MR. CARR'S rights under the Eighth Amendment to the United States Constitution.

111.   The actions of the GOVERNMENT DEFENDANTS in bringing this RICO Indictment against MR. CARR after the UNITED STATES promised to bring no

additional charges against MR. CARR in the District of Nevada except for a crime of violence under section 16 caused severe psychological harm, constituting cruel and unusual punishment in violation of MR. CARR'S rights under the Eighth Amendment to the United States Constitution.

112.    The GOVERNMENT DEFENDANTS violated MR. CARR's constitutional rights by indicting him based on fabricated evidence and violated his plea agreement in the Kane case and committed false imprisonment and malicious prosecution of MR. CARR (i.e., without due process of law and in violation of the Double Jeopardy Clause of the Fifth Amendment) and deprived MR. CARR of his life, liberty and, property rights, which constitutes cruel and unusual punishment in contravention to the Eighth Amendment to the United States Constitution.

113.    As a direct, proximate and, foreseeable cause of the GOVERNMENT DEFENDANTS' egregious conduct, performed in their individual capacities, MR. CARR'S Eighth Amendment Constitutional rights, under *Bivens*, were deprived and, therefore, MR. CARR is entitled to monetary damages for his injuries, including, without limitation: compensatory damages for the impairment of his reputation; personal humiliation; mental anguish and suffering; mental and emotional distress; financial harm; and the loss of gainful employment, including, without limitation, and future impairment for MR. CARR'S chosen profession.

### FOURTH CAUSE OF ACTION
**Conspiracy to Deprive Equal Protection and Due Process Rights**
**(42 U.S.C. § 1985(3))**
**Plaintiff's *Bivens* claim Against the Government Defendants**

114.    MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

115.    Upon information and belief some or all of the GOVERNMENT

DEFENDANTS entered into an agreement to act in concert for the purpose of preventing MR. CARR'S from re-entry into society upon his release from the Bureau of Prisons after his incarceration on the *Kane* case, and brought a RICO Indictment against him for a felony RICO Conspiracy based on fabricated evidence as described in the Statement of Facts; thereby depriving MR. CARR of the equal protection of the laws.  The conspiracy included, but was not limited to, an agreement to reindict, detain, interrogate, and arrest MR. CARR in furtherance of the plan and scheme to secure a second felony conviction against him for RICO conspiracy and cause him to be subjected to possible sentence of life in prison based on fabricated evidence.

116.    "[A] criminal defendant has a due process right to enforce the terms of his plea agreement." *Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006). When the government indicts a defendant with a new charge that is barred by the plea agreement, the defendant may seek specific performance of the plea agreement by moving to dismiss the new charge. *United States v. Plascencia-Orozco*, 852 F.3d 910, 920 (9th Cir. 2017); *see also* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.").  If the new charge breaches the plea agreement, rescission of the plea agreement is not a proper remedy when the defendant has already fulfilled his obligations under the plea agreement—including pleading guilty and serving his sentence—because rescission cannot repair the harm caused by the government's breach. *Buckley*, 441 F.3d at 699.  Rather, the remedy is specific performance, which means in this context dismissing the new charge. *United States v. Transfiguracion*, 442 F.3d 1222, 1237 (9th Cir. 2006).

117.    The Due Process Clause requires "fair play" in the criminal justice system and protects defendants from fundamentally unfair prosecutorial conduct.  *See Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016) (explaining Due Process Clause

exists "as a safeguard against fundamentally unfair prosecutorial conduct"); *Doggett v. United States*, 505 U.S. 647, 666 (1992) (Thomas, J., dissenting) ("[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings."); *United States v. American Honda Motor Co.*, 273 F. Supp. 810, 819 (N.D. Ill. 1967) (explaining Due Process Clause "is essentially a recognition of the requirement of fundamental fairness and fair play").

118. The GOVERNMENT DEFENDANTS performed several acts in furtherance of this conspiracy, including, but not limited to, securing the RICO Superseding Indictment against MR. CARR based on fabricated evidence as described in the Statement of Facts, securing the RICO Superseding Indictment against MR. CARR after promising not to bring any additional charges against him except a crime of violence under section 16 that this RICO Conspiracy was not, violating MR. CARR's Double Jeopardy and Due Process rights and rights under the Fifth Amendment, falsely arresting and imprisoning MR. CARR, maliciously prosecuting MR. CARR, and engaging in abuse of process until MR. CARR was successful in obtaining a R&R from Judge Hoffman recommending that his plea agreement be enforced and recommending that his motion to dismiss with prejudice to enforce plea agreement be granted and thereafter having the RICO Indictment against his dismissed without prejudice when the UNITED STATES filed a Motion to Dismiss Criminal Indictment Pursuant to Federal Rule of Criminal Procedure 48(a) and Judge Navarro signed the order dismissing the case against MR. CARR and closing the case on October 5, 2018. MR. CARR was thereafter released from custody on or about October 7, 2018.

119. The GOVERNMENT DEFENDANTS' actions were not justified under the facts and circumstances of the Original Conspiracy and RICO Conspiracy that arose out of the same Operation Pure Luck and therefore the absence of justification by the GOVERNMENT DEFENDANTS is above contestation under the totality of the

circumstances presented in MR. CARR's case.

120.   The GOVERNMENT DEFENDANTS' plan and scheme, and the overt acts were taken in furtherance of their conspiracy.

121.   The conspiracy in this matter was aided and furthered by the DOJ, the USAONV, and AFT, in concert with the GOVERNMENT DEFENDANTS to fabricate evidence to secure the RICO Superseding Indictment.

122.   The amendment to Title 42, United States Code, Section 1988 provides attorney's fees in actions under Title 42, United States Code, Section 1985.  Attorneys' fees are sought in this Complaint and should be awarded accordingly.

123.   As a result of the conspiracy between and amongst the GOVERNMENT DEFENDANTS, and the overt actions taken in furtherance thereof, MR. CARR suffered damages, including but not limited to, actual damages, loss of liberty, humiliation, fear, and emotional distress.

**Federal Tort Claims Act ("FTCA") – General Allegations**

124.   Pursuant to Title 28, United States Code, Section 1346(b), "federal district courts have jurisdiction over a certain category of claims for which the [UNITED STATES] has waived its sovereign immunity and 'render[ed]' itself liable," including, without limitation, "'claims that are:  [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

125.   "A claim comes within this jurisdictional grant – and thus is 'cognizable' under § 1346(b) – if it is actionable under § 1346(b).  And a claim is actionable under § 1346(b) if it alleges the six elements outlined above." *Id.* (citing *Loeffler v. Frank*, 486 U.S. 549 (1988)).

126.   The FTCA, Title 28, United States Code, Section 2671 et seq., is the exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against Federal employees who commit torts while acting within the scope and course of their employment (28 U.S.C. § 2679(b)(1)).

127.   At all times relevant herein, the GOVERNMENT DEFENDANTS, and any and all unnamed employees of the DOJ, the USAONV, and ATF were acting within the scope and course of their employment within the DOJ, were acting as agents of Defendant UNITED STATES, and were acting as DOJ Attorneys, Assistant United States Attorneys, and investigative and/or law enforcement officers.   The aforementioned GOVERNMENT DEFENDANTS performed acts in their individual capacities for which said GOVERNMENT DEFENDANTS are, and remain, personally liable.

128.   With regard to the GOVERNMENT DEFENDANTS' tortious conduct that was performed while they were "acting within the scope of [their official] office[s] or employment at the time of the incident out of which the [MR. CARR'S] claim[s] arose," Defendant UNITED STATES is solely liable for that conduct as mandated by Title 28, United States Code, Section 2679(d)(2)) and the Federal Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

129.   Similarly, MR. CARR'S exclusive remedy for his tort-based claims against the GOVERNMENT DEFENDANTS' employer is this claim against the UNITED STATES pursuant to Title 28, United States Code, Section 2679(a).

130.   To that end, Title 28, United States Code, Section 2680(h) expressly provides that the UNITED STATES is also liable for certain intentional torts that are based on the "acts or omissions" of an "investigative or law enforcement officer" and include "[a]ny claim arising out of ... false imprisonment, false arrest, [and] malicious prosecution ...." *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (citing 28 U.S.C. § 2680(h); *see also Levin v. United States*, 568 U.S. 503 (2013)).   The DOJ, the USAONV, and ATF are agencies of the government of the United States of America. The Law Enforcement Proviso, inserted into Subsection 2680(h), directs "that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government," the general waiver of sovereign immunity in the FTCA "applies to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."

131.   Here, MR. CARR has valid tort claims arising out of, related to and connected with the GOVERNMENT DEFENDANTS' tortious conduct that was performed in their individual capacities as detailed in the Statement of Facts. Defendant UNITED STATES is liable for the acts of the GOVERNMENT DEFENDANTS pursuant to the doctrine of *respondeat superior* as recognized by the Ninth Circuit Court of Appeals in *Xue Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010). Defendant UNITED STATES, if a private person, would be liable to the MR. CARR for the acts and omissions of its employees and agents described herein under the law of the place where said acts and omissions occurred, including, without limitation, the following claims:

/ / /

/ / /

/ / /

40

### FIFTH CAUSE OF ACTION
### (False Arrest - FTCA)
### Plaintiff's Claim Against Defendant UNITED STATES

132.   MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

133.   The GOVERNMENT DEFENDANTS effected an unlawful arrest of MR. CARR.

134.   The GOVERNMENT DEFENDANTS falsely arrested MR. CARR on the RICO Conspiracy case based on fabricated evidence elicited by KARPEL.

135.   The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Superseding Indictment against MR. CARR and the other Defendants knowing that Mr. Rudnick had recanted before he testified before the Grand Jury in California and knowing that KARPEL had continual and substantial involvement in directing the investigation and developing the witness testimony that ultimately led to Mr. CARR being charged in the RICO Superseding Indictment with an overt act being the alleged murder in Sparks, Nevada in *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13] as alleged in detail in the Statement of Facts caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law.

136.   The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Superseding Indictment against MR. CARR knowing that the UNITED STATES had agreed in a Plea Agreement with MR. CARR in the Original Conspiracy case "not to bring any additional charges against the defendant [MR. CARR] arising out of the investigation in the District of Nevada that culminated in this Plea Agreement and based on conduct known to the United States except that the United States reserves the right to prosecute the defendant for any crime of violence

41

as defined by 18 U.S.C. 16" prior to indicting MR. CARR on June 14, 2017 caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law and subjecting him to Double Jeopardy by charging him with a RICO conspiracy for the same overt acts that he pled guilty to and was incarcerated for in the Original Conspiracy case after the UNITED STATES promised MR. CARR that no additional charges would be brought against him except for a crime of violence under section 16 knowing that the RICO conspiracy was not a crime of violence under section 16.

137.   The Law Enforcement Proviso, inserted into Subsection 2680(h), directs "that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government," the general waiver of sovereign immunity in the FTCA "applies to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." False arrest is derivative tort stemming from false imprisonment and the Law Enforcement Proviso would cover this cause of action.

138.   As a direct, proximate and foreseeable cause of the GOVERNMENT DEFENDANTS' tortious acts related to the effectuation of the unlawful arrest of MR. CARR based on fabricated evidence and in violation of his plea agreement and these acts performed in their official capacity, scope, and employment, the UNITED STATES is, and remains, liable; MR. CARR suffered damages as hereinafter set forth.

### SIXTH CAUSE OF ACTION
### (False Imprisonment - FTCA)
### Plaintiff's Claim Against Defendant UNITED STATES

139.   MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

140.   In Nevada, "[f]alse imprisonment is an unlawful violation of the personal liberty of another, and consists in confinement or detention without legal sufficient authority." Nev. Rev. Stat. § 200.460.  "To establish false imprisonment of which false arrest is an integral part, it is . . . necessary to prove that the person be restrained of his liberty under probable imminence of force without any legal cause or justification." *Jones*, 2011 WL 13305450 at *3 (quoting *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981).  "Thus, 'an actor is subject to liability to another for false imprisonment 'if (a) he acts intending to confine the other . . . within the boundaries fixed by the actor, and (b) his act directly or indirectly results in a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.'" *Id.* (quoting Restatement (Second) of Torts § 35 (1965)).

141.   MR. CARR, here, affirmatively alleges that he was unlawfully arrested based on fabricated evidence used to secure the RICO Superseding Indictment after being released on the Original Conspiracy case, and MR. CARR was subsequently imprisoned and forced into custody by Defendant UNITED STATES for fifteen (15) months, mostly at a sweltering federal private contractor prison in Pahrump, Nevada which is also an ICE detention facility.  Upon completion of the fifteen months of prison, MR. CARR was released upon filing two motions to dismiss wherein he was able to obtain a R&R from Judge Hoffman recommending that his plea agreement be enforced and recommending that his motion to dismiss with prejudice to enforce plea agreement be granted.

142.   On the date the UNITED STATES' objections to the R&R were due, the UNITED STATES filed a Motion to Dismiss Criminal Indictment Pursuant to Federal Rule of Criminal Procedure 48(a) and Judge Navarro signed the order dismissing the case against MR. CARR without prejudice and closing the case on October 5, 2018. MR. CARR was thereafter released from custody on or about October 7, 2018.

143.   This second motion to dismiss on constitutional grounds was still pending when the RICO Indictment was dismissed against MR. CARR.

144.   MR. CARR'S health has been deleteriously affected as a result of his confinement.

145.   The Law Enforcement Proviso, inserted into Subsection 2680(h), directs "that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government," the general waiver of sovereign immunity in the FTCA "applies to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."

146.   MR. CARR further alleges that as a direct, proximate and, foreseeable cause of those tortious acts related to MR. CARR'S incarceration (i.e., acts performed by the DEFENDANTS in their official capacity, scope and, employment, these acts: (a) were performed with the intention of confining MR. CARR to prison; (b) they directly or indirectly resulted in MR. CARR'S confinement; and (c) MR. CARR was conscious of the unlawful confinement.  As a result, the UNITED STATES is, and remains, liable; MR. CARR suffered damages as hereinafter set forth.

### SEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress - FTCA)
### Plaintiff's Claim Against Defendant UNITED STATES

147.   MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

148.   In *Sheehan v. United States*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of emotional distress claim in FTCA actions.  To that end, in Nevada, "[t]he elements of a cause of action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct with either the intention of, or

44

reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation.'" *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev. 1999).

149.   The conduct of the GOVERNMENT DEFENDANTS, as set forth herein, was extreme and outrageous and beyond the scope of conduct which should be tolerated by citizens in a democratic and civilized society.   The GOVERNMENT DEFENDANTS committed these extreme and outrageous acts with the intent to reindict MR. CARR and inflict severe and mental and emotional distress upon MR. CARR.

150.   As a proximate result of the GOVERNMENT DEFENDANTS' willful, intentional and malicious conduct, MR. CARR suffered severe and extreme emotional distress.   Specifically, MR. CARR suffered and/or continues to suffer from the following physical manifestations of emotional distress: sleep disturbances, anxiety, nightmares, and other ailments.   Therefore, MR. CARR is entitled to an award of damages as against DEFENDANT UNITED STATES.   MR. CARR has also suffered general damages as hereinafter set forth and is entitled to compensation therefor.

### EIGHTH CAUSE OF ACTION
**(Malicious and Vindictive Prosecution - FTCA)**
**Plaintiff's Claim Against Defendant UNITED STATES**

151.   MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

152.   In Nevada, "[a] person who maliciously and without probable cause therefor, causes or attempts to cause another person to be arrested or proceeded against for any crime of which that person is innocent" is liable for malicious prosecution.   Nev. Rev. Stat. § 199.310.   In this regard, to state a claim for malicious prosecution under Nevada law, a Plaintiff must allege: "(1) that the defendant lacked

probable cause to initiate a prosecution; (2) malice; (3) the prior criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages." *Anderson v. United States*, 2019 WL 6357256 at *2 (D. Nev. 2019) (quoting *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002).

153.   The Due Process Clause requires "fair play" in the criminal justice system and protects defendants from fundamentally unfair prosecutorial conduct.   *See Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016) (explaining Due Process Clause exists "as a safeguard against fundamentally unfair prosecutorial conduct"); *Doggett v. United States*, 505 U.S. 647, 666 (1992) (Thomas, J., dissenting) ("[T]he Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings."); *United States v. American Honda Motor Co.*, 273 F. Supp. 810, 819 (N.D. Ill. 1967) (explaining Due Process Clause "is essentially a recognition of the requirement of fundamental fairness and fair play").

154.   Courts have recognized the unfairness inherent in fabricating evidence to secure an Indictment and charging in successive prosecutions offenses arising out of the same transaction; "[t]he government is not a ringmaster for whom individuals and corporations must jump through a hoop at their own expense each time it commands." *American Honda Motor Co., Inc.*, 273 F. Supp. at 820; *see Adamson v. Ricketts*, 865 F.2d 1011, 1017–20 (9th Cir. 1988) (en banc); *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986); *see also Abbate v. United States*, 359 U.S. 187, 196–201 (1959) (Brennan, J., concurring) (characterizing as "disturbing" government insistence that it be allowed to bring successive prosecutions under different statutes for same set of facts).

155.   In fact, even the government recognizes the potential problems with successive prosecutions and consequently mandates special approval beforehand. *See* U.S. Attorneys' Manual § 9-2.031 (Petite policy). Thus, "entirely apart from the

Double Jeopardy provision of the Fifth Amendment," the Due Process Clause protects MR. CARR from harassment by the government through "successive grand jury inquiries and indictments for alleged separate conspiracies arising out of the same transaction." *American Honda Motor Co.*, 271 F. Supp. at 987; *see Barnett*, 375 F.2d at 237.

156. The UNITED STATES and the GOVERNMENT DEFENDANTS conducted one investigation into one organization, obtaining one conviction against MR. CARR. Not satisfied with MR. CARR's one-year sentence, the UNITED STATES sought to prosecute MR. CARR a second time for an offense that "aris[es] out of the same nucleus of operative facts as the original charge." *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986) (alteration in original) (quoting *United States v. Robison*, 644 F.2d 1270, 1272 (9th Cir. 1981)); *see Adamson v. Ricketts*, 865 F.2d 1011, 1017–20 (9th Cir. 1988) (en banc), *abrogated on other grounds by Walton v. Arizona*, 497 U.S. 639 (1990).

157. Both charges allege MR. CARR agreed to promote the goals of the Vagos Motorcycle Club through unlawful activities. Both involve the same places, people, and time. And both rely on the same incident from June 2009—the alleged extortion of a former club member.

158. But the charges differed in one significant way: the RICO Conspiracy allowed for a significantly higher sentence than MR. CARR received on the previous conviction and was based on fabricated evidence that KARPEL assisted in obtaining through intimidation and anger. *See* 18 U.S.C. § 1963; *see also Martinez*, 785 F.2d at 669 ("[I]f [a] prosecutor, faced with a disappointing result, acts so as to 'up the ante' for the defendant, the presumption of vindictiveness arises and must be rebutted if the government is to prevail."). In fact, the UNITED STATES was seeking life in prison in the RICO Conspiracy case.

159.   There was no indication from the record that the successive prosecutions of MR. CARR resulted from a reasoned prosecutorial decision, as opposed to dissatisfaction with the result of the first proceeding.

160.   Not only was MR. CARR's alleged participation in the offense completed four years before he was sentenced for the Original Conspiracy, but several of his current codefendants already had been charged with violating RICO.  *Cf. Feliciano v. United States*, 914 F. Supp. 776, 781 (D.P.R. 1996) (explaining that prosecutor's duty of good faith "encompass[es] in certain cases an obligation to inform a defendant during plea bargaining negotiations of other possible criminal charges which may be filed."), *aff'd sub nom. Rivera-Feliciano v. United States*, 107 F.3d 1 (1st Cir. 1997). The prosecutor's actions suggest a reasonable likelihood of vindictiveness and harassment and justify liability for violating MR. CARR's Due Process Rights under the Fifth Amendment and therefore the GOVERNMENT DEFENDANTS are liable to MR. CARR.

161.   MR. CARR here affirmatively alleges that the GOVERNMENT DEFENDANTS' misleading and material representations that MR. CARR could be charged again relating to the same overt acts that he previously pled guilty to and upon information and belief fabrication of evidence and misleading statements of facts by witnesses to obtain the Grand Jury RICO Superseding Indictment evidences the absence of probable cause, along with the malicious intent of the GOVERNMENT DEFENDANTS.

162.   MR. CARR further alleges that the UNITED STATES' dismissal of the RICO Indictment against MR. CARR, coupled the District Court's R&R recommending dismissal of the case for a violation of MR. CARR'S plea agreement in the Original Conspiracy, and the ultimate acquittals of the Defendants in Group No. 1 after trial and ultimate dismissal of all remaining Defendants in the RICO Conspiracy

Superseding Indictment unequivocally establishes that the underlying action was terminated in MR. CARR'S favor.

163.   The Law Enforcement Proviso, inserted into Subsection 2680(h), directs "that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government," the general waiver of sovereign immunity in the FTCA "applies to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."

164.   As a direct and proximate result of the conduct set forth in this Complaint, MR. CARR suffered severe emotional distress, pain and suffering, humiliation, physical injuries, loss of community and reputation, lost business opportunities, lost profits, other damages, and actual and special damages to MR. CARR.

165.   MR. CARR is entitled to punitive damages in an amount to be proven at trial as the actions of the DEFENDANTS named in this claim for relief are characterized by fraud, were committed by each of them knowingly, willfully, and maliciously with the intent to harm injure, vex, harass, and oppress MR. CARR was callous and done in wanton and reckless disregard of the MR. CARR'S rights.  MR. CARR has also suffered damages as hereinafter set forth.

### NINTH CAUSE OF ACTION
**(Abuse of Process - FTCA)**
**Plaintiff's Claim Against Defendant UNITED STATES**

166.   MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

167.   In Nevada, an abuse of process claim has two fundamental elements: (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of a proceeding.  *Executive Mgmt. Ltd. v. Ticor Title Ins. Co.*, 114 Nev.

823, 843, 963 P.2d 465, 478 (1998).  The action for abuse of process hinges on the misuse of regularly-issued process.  *Nevada Credit Rating Bureau, Inc. v. Williams*, 88 Nev. 601, 606, 503 P.2d 9 (1972).

168.   The GOVERNMENT DEFENDANTS' approval of and return of the True Bill in the RICO Superseding Indictment against MR. CARR and the other Defendants knowing that Mr. Rudnick had recanted before he testified before the Grand Jury in California and knowing that KARPEL had continual and substantial involvement in directing the investigation and developing the witness testimony that ultimately led to MR. CARR being charged in the RICO Superseding Indictment with an overt act being the alleged murder in Sparks, Nevada in *United Sates v. Palafox, et. al.*, 2:16-cr-265-GMN-CWH [ECF No. 13] as alleged in detail in the Statement of Facts caused MR. CARR significant pain and suffering by depriving him of his liberty absent due process of law.

169.   MR.  CARR  here  affirmatively  alleges  that  the  GOVERNMENT DEFENDANTS' misleading and material representations that MR. CARR could be charged again relating to the same overt acts that he previously pled guilty to and upon information and belief fabrication of evidence and misleading statements of facts by witnesses to obtain the Grand Jury RICO Indictment evidences the absence of  probable  cause,  along  with  the  malicious  intent  of  the  GOVERNMENT DEFENDANTS.

170.   All of these actions reflect conduct that is unconscionable and falls well below the standard of behavior to be expected of agents and/or employees who represent Defendant UNITED STATES.

171.   The UNITED STATES' frivolous argument that the RICO conspiracy was a crime of violence under section 16 was misguided and unsupportable as a matter of law and fact and issued only to harass and subject MR. CARR to further restraints

upon his liberty, and accordingly, the RICO Indictment of MR. CARR in the RICO Conspiracy case was an abuse of process.

172. This RICO Indictment of MR. CARR in the RICO Conspiracy case in violation of MR. CARR'S due process rights, rights under the Double Jeopardy Clause, and promises in his Plea Agreement in the Original Conspiracy case show a disconcerting pattern of abuse of process as the legally issued process was being used for the purposes of harassment and further detainment which is a purpose other than that which it was designed by law to accomplish.

173. The GOVERNMENT DEFENDANTS' abuse of process continues to the present day. MR. CARR filed a properly timed motion to dismiss that was granted by R&R by Judge Hoffman and the UNITED STATES thereafter dismissed the RICO Indictment against MR. CARR in response to the R&R on October 5, 2018.

174. The Law Enforcement Proviso, inserted into Subsection 2680(h), directs "that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government," the general waiver of sovereign immunity in the FTCA "applies to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."

175. As a direct and proximate result of the conduct set forth in this Complaint, MR. CARR suffered severe emotional distress, pain and suffering, humiliation, physical injuries, loss of community and reputation, lost business opportunities, lost profits, other damages, and actual and special damages to MR. CARR.

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TENTH CAUSE OF ACTION
## (Negligence - FTCA)
## Plaintiff's Claim Against Defendant UNITED STATES

176.    MR. CARR realleges and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

177.    At all times herein mentioned, DEFENDANTS, were subject to a duty of care to avoid causing unnecessary distress to persons through their making of arrests. The GOVERNMENT DEFENDANTS were responsible for conducting themselves in compliance with federal state and local laws, the United States Constitution, and the Code of Conduct for Judicial Employees.  The GOVERNMENT DEFENDANTS breached their duty in this regard in all material respects by eliciting fabricated evidence to secure the Superseding RICO Indictment, arresting MR. CARR, and commencing an illegal prosecution of MR. CARR. The wrongful conduct of the GOVERNMENT DEFENDANTS, as set forth herein, did not comply with the standard of care to be exercised by reasonable persons, proximately causing MR. CARR to suffer injuries and damages.

178.    As a proximate result of the GOVERNMENT DEFENDANTS' negligent conduct, MR. CARR suffered severe physical injury, severe emotional and mental distress, and injury having a traumatic effect on the MR. CARR'S emotional tranquility, and damages should ensue.

## PRAYER FOR RELIEF

**WHEREFORE**, MR. CARR prays that this Court enter a judgment in his favor and against the DEFENDANTS as follows:

1.    Enter a declaratory judgment that DEFENDANTS violated MR. CARR'S rights under the U.S. Constitution and civil rights laws;

2.    Award MR. CARR his nominal and actual damages;

3.      Award MR. CARR compensatory damages in an amount to be determined at trial, and hold DEFENDANTS jointly and severally liable for compensatory damages;

4.      Award MR. CARR punitive damages in an amount to be determined at trial;

5.      Award MR. CARR general damages in an amount to be proven at trial as to each and every claim herein;

6.      Award MR. CARR pre-judgment and post-judgment interest as allowed by law;

7.      Award MR. CARR their reasonable costs, expenses and, attorneys' fees, pursuant to all applicable state and federal statutes, codes, and rules and as allowed;

8.      Grant such further relief as this Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

MR. CARR hereby demands a trial by jury on all issues in this action to the extent authorized by law.

DATED this 5th day of February 2021.

MELANIE HILL LAW PLLC


*Melanie A. Hill*
MELANIE A. HILL, ESQ.
Nevada Bar No. 8796
520 S. 7th Street, Suite A
Las Vegas, NV  89101
Tel.     (702) 362-8500
Fax.     (702) 362-8505
Email:  Melanie@MelanieHillLaw.com
*Attorneys for Plaintiff Steven Earl Carr*